**Linda LIMON, Plaintiff,**

v.

**Donna SHALALA, Secretary of Health and Human Services, Defendant.**

Civ. A. No. 94–K–2377.

United States District Court,
D. Colorado.

April 24, 1995.

---

Mark A. Rau, Norton Frickey & Associates, P.C., Lakewood, CO, for plaintiff.

Mark Pestal, Asst. U.S. Atty., Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Linda Limon appeals the final administrative action of the Secretary of Health and Human Services ("Secretary") denying her Supplemental Security Income ("supplemental") benefits under Title XVI of the Social Security Act ("Act"), 42 U.S.C.A. §§ 1381–1383c.

The Administrative Law Judge ("ALJ") found Limon could return to her "past relevant job" as a housekeeper. (Record of Proceedings Transcript (Tr.) at 17.) The Appeals Council declined to review the ALJ's findings making it the Secretary's final decision. (Tr. at 4.)

The ALJ so ruled despite evaluations from Social Security Administration ("Administration") staff contradicting the finding Limon could return to her previous job as a housekeeper. (Tr. at 136, 153, 159.) Earlier, the Administration denied her application, including after reconsideration, because it found she could do other work. (Tr. at 76, 81.)

### I. *Background*

In her young life, Limon has suffered a number of difficult and sometimes puzzling medical ailments. She was born June 12, 1965. (Tr. at 31.) The ALJ found she had at least four abdominal surgeries: an appendectomy and laparotomy (surgical incision of the abdomen) in 1980, a cholecystectomy (gall bladder removal) in 1987, a small bowel resection in 1989 and a hysterectomy and bilateral salpingo-oophorectomy (uterus, ovaries and tubes removal) in 1991. (Tr. at 13.) [1]

She has given birth to four children and had a tubal ligation and a laparoscopy (examination of the interior abdomen with a scope) to remove adhesions in 1990. (Tr. at 383.) At least three of these surgeries, in 1987, 1989 and 1991, followed closely upon emergency room visits where Limon arrived at the hospital in pain. (Tr. at 162, 172, 233, 285.) In 1982 at the age of sixteen, she fell

---

1. Unless otherwise noted, medical definitions are taken from *Dorland's Illustrated Medical Dictionary*, (25th ed. 1974).

from her father's pickup and spent five days in the hospital with a concussion and back pain. (Tr. at 183, 184.)

Dr. Ernest Bussinger cared for Limon on and off for more than ten years until 1991. (Tr. at 383.) The ALJ noted Bussinger would not give a disability recommendation because he had not seen her in more than a year. (Tr. at 13.) She also highlighted that Bussinger reported Limon felt no pain at her checkup following her hysterectomy. (Tr. at 13.)

In a November 1992 letter, Bussinger noted Limon should be able to work "with no problems," conditioned on her using hormone replacement and having no more pelvic adhesions. (Tr. at 384.) "If she does have recurrence of pelvic adhesions, that certainly could be significant enough that it may prevent her from being able to do certain things as far as work." (Tr. at 384.)

Between her original and reconsidered filings for social security during May to November 1992, Limon states she required emergency care four times. (Tr. at 79, 100.) During her October 10, 1992 visit, she says the doctor told her adhesions caused abdominal pain. (Tr. at 100.) The transcript contains no medical or hospital records from these visits, although it does contain records from her 1993 visits to the University of Colorado Health Sciences Center. The ALJ noted Limon's abdominal pain has been related to endometriosis (membrane of the uterus invading other tissue), adhesions and scar tissue. (Tr. at 13.)

The Disability Determination Service sent Limon for an evaluation by Dr. Stephen Gorshow in August 1991. (Tr. at 337.) The ALJ noted Gorshow reported no abnormal bowel sounds or other abnormalities and her abdominal pain would not prevent most types of work. (Tr. at 13.) His examination disclosed mild back spasms and minimal tenderness but no indications of radiculopathy (nerve root disease). (Tr. at 14.)

The ALJ found the University of Colorado Health Sciences Center's May 1993 exam confirmed these findings of Gorshow. (Tr. at 14.) Specifically, she found this neurosurgical evaluation revealed normal strength, reflexes and sensation and the MRI was negative for radiculopathy or spinal stenosis (narrowing of the canal). (Tr. at 14.) She further noted Limon failed to show up for a July appointment at the rheumatology clinic. (Tr. at 14.)

From this evidence, the ALJ concluded Limon's back pain would rule out medium to heavy work, but she had no significant movement limitations. (Tr. at 14.) She then found Limon could do light work, such as her past housekeeping type work. (Tr. at 14.) The ALJ omitted, however, other relevant evidence contained in the sources she cited.

Gorshow's report included some facts the ALJ did not mention. He concludes, "[s]he appears to have chronic lumbosacral sprain type problem," possibly complicated by fibrositis (inflammation of fibrous tissue especially muscle sheaths). (Tr. at 338.) He also believed her back impairment would prevent heavy lifting meaning, "She probably could perform sedentary activities if she were allowed to change positions regularly." (Tr. at 338.) He also found her range of motion limited by back pain and muscle spasms. (Tr. at 338.)

The University's records, though often illegible, contain additional pertinent facts. For example, in response to Limon's complaints of abdominal pain, examination revealed abdominal and bladder tenderness and blood in her stool. (Tr. at 441, 442.) Later examinations found a lump external to the lumbar spine and hands and feet that were blue and numb. (Tr. 425, 426.)

The University considered her abdominal condition warranted trigger point injection shots among other courses of treatment. (Tr. at 434.) Records indicate she hyperventilated after one set of injections. (Tr. at 431.) In her testimony to the ALJ, Limon described this as a "bad incident," where her heart rate and blood pressure dropped. (Tr. at 38.) She decided not to go back for any more shots. (Tr. at 38.) In addition, a University report describes Limon's dissatisfaction with the University's care after one physician "ran out" to take care of another matter and did not return to finish her consultation with Limon. (Tr. at 431.)

The ALJ highlighted Limon's improvement after Limon had listened to relaxation tapes, and referred to it as her primary treatment from the University. (Tr. at 16.) Besides not mentioning the trigger point shots, the ALJ failed to note University medical records which repeatedly list a series of medications Limon was taking or had taken (Tr. at 426, 434.) Current medications in March 1993 included: Provera, Elavil, qHS, Anaprox and ethyl chloride. (Tr. at 434.) The same document reported Limon had also taken Carisoprodol, Zantac, Tylox and Hydrocodone. (Tr. at 434.) The Administration's own files note she took multiple medications. (Tr. at 149.)

Upon filing for reconsideration, the Administration had her evaluated psychiatrically by Dr. Erwin Mozer. (Tr. at 387.) The ALJ found Mozer "did not document any severe mental or emotional impairment." (Tr. at 14.) He concluded she is very angry but not paranoid and has somatoform (affecting the body) pain disorder. (Tr. at 388.)

Limon left Nebraska for Colorado to escape abusive ex-husbands and boyfriends. (Tr. at 387.) Apparently, she left some time after August 1991 when she went to her post-hysterectomy check-up with Dr. Bussinger in Nebraska. (Tr. at 340.) She has four brothers in Colorado. (Tr. at 387.) Her family and a friend, Michael O'Donahue, help her care for her children. (Tr. at 53, 429.)

The ALJ rejected the conclusions in the vocational assessment prepared by O.T. Resources, a firm hired by Plaintiff. The ALJ reasoned, "the medical evidence fails to document impairments which would cause the type of limitations outlined in the report," nor did Limon's daily activities support such limitations. (Tr. at 15.) Therefore, I do not refer to these facts except to note O.T. Resources found Limon could not do her previous housekeeping work and could do sedentary work at most, a finding similar to earlier Administration determinations. (Tr. at 15, 153.)

The ALJ noted Limon does her housework, takes care of the children, volunteers at a day care center and does errands. (Tr. at 15, 16.) She concluded Limon's "daily regimen at present is as strenuous as her prior [sic] job as a housekeeper." (Tr. at 16.) Suffice to say, medical records and the testimony of family and friends conflict with this conclusion. (Tr. at 48, 56, 429.)

The ALJ failed to mention any of the Administration's earlier rulings or findings. At the request of the agency's Disability Determination Service, Dr. George Twomby performed a residual functional capacity assessment in September 1992 before the agency first denied Limon benefits. (Tr. at 155.) Twomby specifically found Limon could not occasionally nor frequently lift more than ten pounds. (Tr. at 149.) In his report, he referred to an unspecified medical chart that limited her to ten pounds of lifting. (Tr. at 149.) He concluded by giving her pain some weight and reducing her residual capacity to sedentary work. (Tr. at 153.)

Later, during a March 1993 psychiatric review before the agency issued its reconsidered decision, the doctor (name illegible) checked off the space on the form for where he can recommend a residual capacity assessment. (Tr. at 138.) This form's explanatory note states residual capacity assessments are appropriate where the doctor considers the patient to have a severe impairment. (Tr. at 138.)

The agency's vocational expert found Limon limited to sedentary work both upon initial consideration before Twomby's assessment and later upon reconsideration after his assessment. (Tr. at 135, 158.) The expert also made notes of Limon's ten pound lifting limit. (Tr. at 135, 158.) On both occasions—in September 1992 and March 1993—the expert further found Limon could not return to past relevant work with a note that "none established as SGA," [presumably referring to substantial gainful activity]. (Tr. at 136, 159.)

Limon has never worked more than eleven months at any job. (Tr. at 106.) In 1985 she earned $3,717.88 and worked at most ten months. (Tr. at 90, 96, 106.) That year she may have performed substantial gainful activity ("gainful activity") within the meaning of the Act, for the only time in her life. *See* 20 C.F.R. § 416.910; *Jozefowicz v. Heckler,* 811 F.2d 1352, 1356 (10th Cir.1987) (substan-

tial services with reasonable regularity in competitive employment are gainful activity.)

Although the agency denied her benefits, both the initial and reconsidered decisions explicitly found Limon could not return to her past work. (Tr. at 76, 81.) The first decision reads, "We realize that your overall condition prevents you from doing the type of work you have done before, but, at your age, (twenty-seven years), and with your education (eleven years), you can do other work." (Tr. at 76.)

Precisely because Limon cannot return to her past work, the perfunctory conclusion that she can do other work requires further evaluation.

## II. *Standard of Review*

■ The decision of the Secretary, in this case that of the ALJ, is reviewed to ensure substantial evidence in the record supports her findings and to ensure she applied the correct legal standard. *Hamilton v. Secretary of Health and Human Services*, 961 F.2d 1495, 1497 (10th Cir.1992) (citing *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir.1988)). The court meticulously examines the entire record. *Williams v. Bowen*, 844 F.2d 748, 750 (citation omitted). "The Secretary's findings stand if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hamilton*, 961 F.2d at 1498 (quoting *Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983)).

■ The Secretary determines disability using a five-step process. *See* 20 C.F.R. § 404.1520 (1991); *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir.1992). At the fourth step, the ALJ found Limon could still do her past relevant work as housekeeper and, therefore, denied her supplemental benefits. At this point Limon has the burden of showing she cannot return to her specific job, and to that type of work in general. *See Jozefowicz*, 811 F.2d at 1357 (citing *Tillery v. Schweiker*, 713 F.2d 601 (10th Cir.1983)); *see also* 20 C.F.R. § 416.920(e). Despite the tension with the claimant's burden, the ALJ retains the duty of inquiry. *Henrie v. U.S. Dep't of Health and Human Serv.*, 13 F.3d 359, 361 (10th Cir.1993). The ALJ's duty includes review of the claimant's residual capacity. *Id.*

■ In this case, the court reviews these step four findings for substantial evidence but must neither reweigh the evidence nor substitute its judgment for that of the ALJ. *See Jozefowicz v. Heckler*, 811 F.2d at 1357. A fact-finder's simple search of the record for isolated bits of evidence, however, does not pass the substantial evidence test. *Pettyjohn v. Sullivan*, 776 F.Supp. 1482, 1486, *remanded for further findings on other grounds sub nom., Pettyjohn v. Shalala*, 13 F.3d 406 (10th Cir.1993) (unpublished opinion), *on remand* 874 F.Supp. 305 (D.Colo. 1995); *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir.1986). Likewise, mere conclusion will not meet the test. *Williams*, 844 F.2d at 750.

## III. *Merits*

The central issue in this case is Limon's ability to return to housekeeping work. More specifically, the case focuses on her residual capacity given her assorted alleged impairments.

### A. *The Administration's Conflicting Determinations*

■ The nearly 500 page record, much of it about unresolved medical problems or containing otherwise illegible medical records, offers an uncertain, but pained picture of Limon. Limon herself fails to offer a consistent chronology and it is difficult to trace her medical problems through the record. In contrast, the Administration makes some clear but contradictory findings.

The conflicting conclusions of the agency staff and the ALJ, who mentioned nary a word of the staff's determinations in her opinion are most puzzling. At least twice, the Administration determined Limon could not return to her previous "type of work" in the eighteen months before the ALJ decided she could. (Tr. at 15, 76, 81.) Furthermore, the ALJ found Limon could do light work with twenty pounds of lifting when the agency's own doctors and vocational experts limited her to ten pounds of lifting and sedentary work. (Tr. at 15, 135, 149, 153, 158.)

The Secretary perfunctorily argues in a footnote that earlier decisions do not bind an ALJ. (Def.'s Answer Br. at 8.) As authority, the Secretary cites a case where the Social Security Appeals Council overruled an ALJ and was found not to be bound by the ALJ's determination. *Id.,* (citing *Campbell v. Bowen,* 822 F.2d 1518, 1522 (10th Cir. 1987)).

In this case, such an assertion is not persuasive in light of the rule that administrative agencies must give specific reasons for their decisions. *Reyes v. Bowen,* 845 F.2d 242, 244 (10th Cir.1988). The *Reyes* court held the Appeals Council cannot ignore the ALJ's recommendation, although it may disagree with it. *Id.* Decisions regarding past relevant work, specifically those regarding residual capacity, "must be developed and explained fully." Soc.Sec.Rul. 82–62. In Limon's case, the ALJ inexplicably violated these rules by ignoring, without even a footnote, previous Administration determinations regarding Limon's past relevant work and her residual capacity. While the ALJ may disagree with previous determinations, she cannot expect her decision to withstand the substantial evidence test without some sort of reason for the reversals. This is particularly so in this case where, contrary to the Secretary's determinations, substantial evidence supports a finding Limon cannot return to her past work, as discussed in the next section.

### B. *Limon's Past Work and her Residual Capacity*

■ Limon argues the ALJ failed in her duty of inquiry, (Pl.'s Br Supp. Compl. at 3) and, specifically, failed to determine Limon's residual capacity. As discussed above, the ALJ failed to explain her reversal of previous Administration determinations. In addition she failed sufficiently to inquire into Limon's residual capacity. As a result, substantial evidence does not support her finding that Limon retains the residual capacity for light work, specifically housekeeping jobs.

The ALJ cites several parts of the medical record indicating Limon retains a capacity to work. (Tr. at 13, 14.) Despite factual accuracy, these citations shortchange the record in two ways.

■ First, the ALJ dismisses much of the evidence favorable to Limon, apparently because she finds Limon lacks credibility. (Tr. at 17.) Based on (lack of) credibility, the ALJ is entitled to discount Limon's testimony and the O.T. Resources evidence. *See Musgrave v. Sullivan,* 966 F.2d 1371, 1376 (10th Cir.1992). However, the ALJ cannot ignore other objective evidence favoring Limon simply because she has already found Limon not credible. Ignoring such evidence violates both her duty of inquiry, *Henrie,* 13 F.3d at 361, and the prohibition on picking through the record for isolated bits of evidence, *see Pettyjohn,* 776 F.Supp. at 1486.

Second, after citing assumedly credible sources, the ALJ ignored contrary evidence from the same source. This suggests the findings are mere conclusion. *See Williams,* 844 F.2d at 750. This practice is akin to the prohibited practice of picking through the record for isolated bits of evidence. *See Pettyjohn,* 776 F.Supp. at 1486.

The ALJ cites, for example, Bussinger's letter where he declines to take a position on Limon's disability. (Tr. at 13.) The ALJ does not mention the later statements in the letter that reappearance of her past history of adhesions could limit her ability to work. (Tr. at 384.) Furthermore, the University found Limon's abdominal pain and history of adhesions significant enough to treat with trigger point shots.

In another example, the ALJ appears to dismiss Limon's University exams as unsupportive of disability, highlighting relaxation tapes as her primary treatment. (Tr. at 16.) She also noted University examinations failed to establish radiculopathy or spinal stenosis. (Tr. at 14.) Records show the tapes permitted Limon to sleep but made no reference to pain relief. (Tr. at 434.) The ALJ ignored the failure of the trigger point injection treatments and the University's list of Limon's five medications. (Tr. at 434.) The ALJ also did not note the abdominal and bladder tenderness, blood in her stool or dyspareunia (painful coitus) that preceded this attempted treatment. (Tr. at 440–442.)

The Secretary concedes the surgeries, resulting scar tissue and adhesions, and the somatoform pain disorder constitute impairments. (Def.'s Answer Br. at 3.) These impairments combined with the medical evidence of falling out of the truck gives Limon an objective nexus for her complaints of abdominal and back pain so they must be given consideration. *See Musgrave*, 966 F.2d at 1375–1376. The Secretary argues Limon's impairments cannot constitute a disability since the relaxation tapes indicate the impairments are subject to treatment. Def.'s Answer Br. at 5, (citing *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir.1988) and *Dixon v. Heckler*, 811 F.2d 506, 508 (10th Cir.1987)). In addition, the Secretary can disregard Limon's subjective complaints due to inconsistencies in the record. *See Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir.1988).

■ The Secretary, however, overstates the case. If an impairment can reasonably be treated or controlled it cannot constitute a disability. *Johnson*, 864 F.2d at 348. The record indicates Limon's relaxation tapes help her sleep. Sleep deprivation has not been cited as one of her impairments. To the contrary, the University's list of treatments, including trigger point shots and various medications, have not significantly ameliorated her abdominal condition. Disregarding Limon's personal complaints, the objective medical records show effective long-term treatment for her abdominal condition has eluded Limon since at least her emergency bowel resection in 1989.

The Secretary correctly points out pain in combination with other impairments must preclude Limon from gainful activity. (Def.'s Answer Br. at 2 (citing *Musgrave*, 966 F.2d at 1375–76)). However, step four of the five-step process focuses more narrowly on the claimant's residual capacity. *See Henrie*, 13 F.3d at 361; Soc.Sec.Rul. 82–62. If she cannot return to her past work, the process moves to step five where the Secretary has the burden of showing she cannot perform gainful activity. *See Trimiar*, 966 F.2d at 1329.

The Secretary has legal grounds for discounting some evidence, particularly Limon's subjective pain complaints. However, evidence is not a zero-sum game. The ALJ's discrediting of evidence in support of Limon's case does not equate to an evidentiary credit supporting her duty to determine residual capacity. Although in tension with Limon's evidentiary burden, the ALJ has the responsibility to evaluate affirmatively Limon's residual capacity. *See Henrie* 13 F.3d at 361. In fact, the ALJ's conclusion on Limon's residual capacity to do light work, specifically housekeeping, is based largely on the negation of Limon's evidence. There is an absence of inquiry or at least an absence of consideration of the full record.

The evidence most directly relating to residual capacity demonstrates Limon's inability to perform her past housekeeping work. First of all, as discussed in the previous section, the ALJ ignored the earlier Administration determinations stating Limon could not return to her past "type" of work.

Twomby for the Disability Determination Service, specifically reduced Limon's "objective" residual capacity from light to sedentary work. (Tr. at 153.) He noted she could not lift more than ten pounds. (Tr. at 149.) The vocational expert specifically found Limon could not return to her previous work. (Tr. at 136, 159.) The expert further found Limon was limited to sedentary work with notations that apparently indicated her ten pound lifting restrictions. (Tr. at 135, 158.)

Gorshow's testimony suggests she could do sedentary work at most and only with some ability to sit and stand. (Tr. at 338.) Limon stated Bussinger has limited her to lifting no more than 10 pounds, (Tr. at 100,) limiting her to sedentary work. O.T. Resources' testimony, rejected by the ALJ, coincides with this evidence showing Limon's inability to return to her past housekeeping work and her restriction to sedentary work. (Tr. at 15).

Collectively, the above amounts to substantial evidence that Limon cannot return to her previous housekeeping work, either to her specific job or this type of work in general.

## IV. *Conclusion*

I conclude the ALJ's decision, adopted by the Secretary, that Limon could return to her previous housekeeping work, is not based

on substantial evidence. As an initial matter, the ALJ did not articulate any reasons for reversing a determination supported by the judgment of several other Administration staff. In deciding Limon's residual capacity, the ALJ apparently ignored staff evidence. Furthermore, she cited evidence from assumedly credible sources to support her finding and omitted evidence from the same sources that undermine her finding.

Consequently, I find Limon cannot return to her past relevant work and review of her application should proceed to the fifth step. The Secretary's decision is REVERSED and REMANDED for further proceedings. Specifically, the Secretary should determine Limon's impairments and residual capacity and then evaluate whether she can work at any jobs that exist in significant numbers. This is a final order (fourth sentence remand) for attorneys fees under Equal Access to Justice Act.

